Wm. C. Williams, sr. v. Wm. C. Williams, jr.

8b 241
90 145
8b 241
97 520

CASE 45—PETITION EQUITY—OCTOBER 5.

# Wm. C. Williams, Sr. v. Wm. C. Williams. Jr.

APPEAL FROM THE LOUISVILLE CHANCERY COURT.

1. A TRUST WAS CREATED BY PURCHASING LAND AT EXECUTION SALES UPON A VERBAL AGREEMENT BETWEEN THE OWNER AND THE PURCHASER that the purchaser would hold the land as security for the money advanced and interest, and that the owner should have the right to redeem.

2. Acquiring and holding the legal title to land by purchasing at execution sales and otherwise, under a verbal agreement between the owner of the land and the purchaser that the land and title should be held as a security for moneys advanced and interest thereon, and that the owner should have the right to redeem the land, created a trust which is enforced.

3. In this case the purchaser held the legal title to the land about fifteen years before the suit was brought in which the trust was established and enforced against him on his verbal agreement to hold the land and permit its redemption, etc. See opinion for a full statement of the facts and evidence establishing the trust.

4. Time for redeeming land sold under execution being extended beyond one year by the purchaser, he is entitled to ten per cent. interest per annum for one year only. In such a case interest should be calculated at the rate of ten per cent. per annum for one year, and after adding that to the principal interest should be calculated thereafter at the rate of six per cent. per annum.

BARRET & ROBERTS, .  
JAMES HARLAN, . .  } . . . . . . . . For Appellant,  
BARR & GOODLOE, .  

CITED

On Evidence:

    1 Greenleaf on Evidence, section 554.
    2 Phillips on Evidence, 88.

2 Daniels's Chancery Practice, 866.
11 B. Monroe, 278, Heath v. Halbert.

*On the Statute of Frauds:*

Brown on Statute of Frauds, secs. 239, 95, etc.
Revised Statutes, 1 Stanton, 484, 485.
Revised Statutes, 2 Stanton, 230.
9 Dana, 108, Thomas v. McCormack.
6 Dana, 331, Graves v. Dugan.
3 Marshall, 24, Fischli v. Dumarsly.
3 J. J. Marshall, 355, Edrington v. Harper.
9 B. Monroe, 452, Griffin v. Coffey.
16 B. Monroe, 8, Martin v. Martin.
2 Bush, 408, Miller v. Antle.
4 Bush, 586, Green v. Ball.
1 P. Wms. 618, Montacute v. Maxwell.
4 Bibb, 103, Parker's heirs v. Bodley.
5 Littell, 74, Thompson v. Patton.
5 Bush, 176, Harper v. Harper.
2 J. J. Marshall, 114, Oldham v. Hadley.
19 Howard, 287, Babcock v. Wyman.
6 B. Monroe, 103, King & Casey v. Curd.
1 Marshall, 385, Crumbaugh v. Russell.
1 Dana, 2, Hanley v. Blackford.
5 Johnson's Chancery, 12, Steere v. Steere.
1 M. & B.'s Statutes, 734.
4 Bibb, 103, Parker v. Bradley.
3 Littell, 402, Stark's heirs v. Cannady.
3 Metcalfe, 474, Hooker v. Guntry.

*On the Deeds to Appellant:*

Civil Code, sections 426, 427, 428.
Revised Statutes, art. 15, chap. 36, 1 Stanton, 488.
4 Bush, 662, Bondurant v. Owens.
6 Bush, 325, Campbell v. Wooldridge.

*On the Accounts between the Parties:*

Waterman on Set-off, etc., 7.
5 J. J. Marshall, 256, Head v. Manners.
5 Bush, 447, Warren v. Perry.
19 Arkansas, 230, Hill v. Austin.
19 Barbour, 640, Kingston Bank v. Gay.
3 Sand. Chan. Rep. 305, Green v. Storm.
12 Eng. Law and Equity, 570, Thomas v. Cross.

Wm. C. Williams, sr. v. Wm. C. Williams, jr.

JOHN M. HARLAN, ⎱
L. A. WOOD, . . ⎰ . . . . . . . . . For Appellee,

CITED

Story's Equity Juris., secs. 252, 256, 768, 1265.
Revised Statutes, 2 Stanton, 134.
Leading Cases in Equity, 624–643.
Hill on Trustees, 152, 153, 162.
12 Howard, 148, Russell v. Southard.
7 Cranch, 241, Conway v. Alexander.
1 Howard, 126, Morris v. Nixon.
2 Eden, 110, Vernon v. Bethel.
2 J. J. Marshall, 114, Oldham v. Hadley.
3 J. J. Marshall, 354, Edrington v. Harper.
19 Howard, 289, Babcock v. Wyman.
3 Story's Reports, 293, Jenkins v. Eldridge.
4 Kent, 143, 5th edition.　　2 Sumner, 228.
3 Yerger, 513, Overton v. Bigelow.
34 New York, 307, Ryan, &c. v. Dox.
9 B. Monroe, 452, Griffin, &c. v. Coffey.
16 B. Monroe, 8, Martin v. Martin.
2 Bush, 408, Miller's heirs v. Antle.
4 Bush, 586, Green v. Ball.
2 Vesey, sr. 225, Dixon v. Parker.
1 Paige, 202, Whitteck v. Kane.
2 Sumner, 538, Flagg v. Mann.
15 Connecticut 575, Brainard v. Brainard.
13 Vermont, 341, Wright v. Bates.
1 Hoffman's Chan. Rep. 331, Humphrie v. Humphrie.
1 Greenleaf, 86.　　　　4 Johnson, 167.
1 Marshall, 170, Prince v. Bearden.
2 Hayward, 141, Foy v. Foy.
1 Wash. 14.　　　　　6 Har. Johnson, 435.
1 Porter (Ala.) 318.　　1 Johnson, 582.
15 Johnson, 555.　　　14 Wend. 65.
6 Johnson's Chancery, 417.
2 Johnson's Chancery, 189.
1 Duvall, 382, Hinton v. Mitchell.
4 Bush, 662, Bondurant v. Owens.
2 Bibb, 71, Chiles v. Woodson.
4 Bibb, 102, Parker v. Bodley.
5 Littell, 74, Thompson v. Patton.
6 Dana, 331, Graves v. Dugan.
5 Bush, 176, Harper v. Harper.

Wm. C. Williams, sr. v. Wm. C. Williams, jr.

38 Illinois, 405.

14 Wisconsin, 457.

44 Barbour, 138.

4 Greene, 34.

27 Georgia, 490.

26 Connecticut, 368.

2 Wms. Vt. 237.

29 Alabama, 254.

5 McLean, 281.

1 Paige, 206.

5 Blackford, 361.

10 Yerger, 121.

8 Hum. 378, 460.

18 Iowa, 504.

15 Johnson, 555.

4 Hen. & Mumf. 101.

1 Vernon, 190.

2 Yerger, 294.

2 Littell, 118.

8 Humph. 520.

4 Johnson's Chancery, 222.

4 Johnson's Chancery, 167.

4 Russell's Chancery, 423.

2 Woodbury & Minot, 432.

14 B. Monroe, 624, Langhorn v. Payne.

16 B. Monroe, 8, Martin v. Martin.

9 B. Monroe, 267, Southard v. Pope.

7 Bush, 80, Ferguson v. Smith.

25 Texas, 271.

29 California, 18.

38 Mississippi, 578.

5 Minnesota, 178.

7 Michigan, 12.

1 Grant, 301.

18 Arkansas, 34.

2 Jones, 209.

6 Bennett, 321.

2 Cowen, 324.

1 Head, 110.

6. Hum. 64.

10 Hum. 349.

2 Mumf. 20.

1 Call, 244.

9 Wheaton, 653.

2 Vernon, 402.

4 Desaus. 652.

4 Iredell's Equity, 171.

7 Alabama, 669

CHIEF JUSTICE PRYOR DELIVERED THE OPINION OF THE COURT.

W. C. Williams, jr., was the owner by devise from his father, Daniel Williams, of a tract of thirty-three and one third acres of land adjacent to the corporate limits of the city of Louisville. On the 15th of July, 1855, this land was sold under an execution from the Jefferson Circuit Court in favor of the Louisville and Shepherdsville Plank-road Company against the said Williams for the sum of $654.31, and purchased by Levi Tyler as the agent of the company.

In June, 1855, an execution issued upon a judgment from the same court in favor of James Brown against Williams for three hundred and nine dollars, and this execution was

replevied by Williams, with the appellant, W. C. Williams, sr., and David Meriwether as his sureties on the replevin-bond. An execution afterward issued on this replevin-bond, and on the 4th of February, 1856, the appellee's equity of redemption in this land was sold, the plaintiff Brown becoming the purchaser thereof for $361.48.

On the 15th of July, 1856, Brown assigned to Williams, sr., and David Meriwether the benefit of his purchase, including all his title and interest acquired under it. Tyler, who had made the purchase under the first execution, also assigned to these same parties, Meriwether and Williams, sr., all the right, title, and interest acquired in the lands by reason of his purchase. By the will of Daniel Williams the devise of this land, or the land itself, was charged with the payment of certain sums of money devised to the brothers and sisters of the appellee. White and wife, who were interested in this lien created by the will, obtained a judgment in the Louisville Chancery Court against the appellee, enforcing a part of their lien, and in June, 1858, two acres of this tract of land was sold to satisfy this judgment, amounting to ——, and David Meriwether became the purchaser at ——, and gave bond, with Williams, sr., his surety.

In October, 1860, Meriwether, by a conveyance without warranty, sold all his interest in this land to the appellant, W. C. Williams, sr., for the sum of four hundred and twenty dollars.

In September, 1861, White and wife had another judgment to enforce their lien, yet unpaid, and on the 17th of March, 1862, there was a sale under this judgment, and W. C. Williams, sr., became the purchaser for the sum of $1,254.94.

After the assignment by Brown and Tyler to Meriwether and Williams, sr., of the executions under which the land was first sold, the deputy sheriff, on the 17th of November, 1856, made them a deed for this land, and the commissioner

in a few days after his sale, under the last judgment of White and wife, made to Williams, sr., a deed to this land also by . reason of that purchase; and Meriwether having conveyed to him the interest he had acquired, Williams, sr., thus became invested with the legal title to the whole tract.

The appellee, W. C. Williams, jr., on the 4th of January, 1870, filed this suit in the Louisville Chancery Court, in which he alleges that the transactions between Brown and Tyler on the one side, and Meriwether and the appellant on the other, resulting in the transfer to them of these executions and the sales under them, were all for his benefit, under an agreement made to that effect; that each and every purchase made by them was under a like agreement and trust, with the right of the appellee to redeem the property, and that the appellant held it merely as security for the repayment of moneys advanced by him; that the deeds were made by the sheriff and commissioner to this land without his knowledge or consent; that the appellant never set up any claim to the land otherwise than as stated until August, 1869, at which time he claimed the property absolutely, and is now fraudulently withholding the title. He also claims a large sum of money for services rendered the appellant in renting out his (appellant's) property, and in attending to his business generally; that the value of these services amounts to a sum more than sufficient to repay the appellant all the moneys advanced for him.

The appellant in his answer denies any agreement to hold this property in trust for the appellee, and insists that he bought the property for his own purposes, and that all the purchases made by him were absolute and unconditional; that he regarded the purchase as a bargain, and it was always his intention to give the plaintiff a part of it, simply as a gratuity, and that he had in fact directed him to fence off twenty acres of the land. He also relies upon the statute of frauds, etc.

It will be unnecessary to recite in detail the mass of testimony in this large record adduced by each party upon the questions involved.

It seems that Williams, jr., about the time his property was sold under the execution in favor of Brown and Tyler, had been unfortunate in his domestic relations, and a suit was then pending in the Louisville Chancery Court against him by his wife for a divorce and alimony. His cousin Williams, sr., was his friend and confidential adviser during the litigation with his wife; and in fact seems by his advice to the appellee to have induced him to abandon the management of the defense and intrust it almost altogether to the appellant. While this suit was pending, and shortly after the sale of appellee's land under the execution of Brown and Tyler, the appellant had an interview by previous arrangement with the appellee at the law-office of Rousseau in Louisville, for the purpose of devising some means to relieve the appellee from his pecuniary embarrassments, and to aid him in the suit then pending against him by his wife. This interview was private, and not in the presence of the attorney, and all he knows in regard to it is that when it terminated, and the parties were about to leave, they told him that the arrangement had been agreed upon between them, but did not state its terms. This meeting, in the language of the witness Rousseau, was to assist him, either "*by advancing him money, or in aiding him to obtain it from others.*"

Shortly after this interview the money was paid by Meriwether and Williams, sr., to the purchasers under the execution, and the bids transferred to them. Meriwether in his deposition in the divorce case, although claiming to have made an absolute purchase of the land, says, in speaking of that purchase and the time at which the right to redeem expired, "that the fellow was about *losing his land, and the transfers were made to us,*" meaning himself and the appellant.

In 1856, when the first sales were made of this land under execution, it was worth from ten to fifteen thousand dollars, and in the year 1860, when Meriwether conveyed his interest in the land to the appellant, it was worth fifteen or twenty thousand dollars. The interest of Meriwether at this time in the land, if owned by him as alleged, was worth not less than eight thousand dollars; and it is difficult to conceive why he would thus dispose of such valuable property, adjacent to the growing and prosperous city of Louisville, increasing in value greatly every year, to the appellant for the nominal consideration of four hundred and twenty dollars. The appellant was himself wealthy, and had no claims upon the generosity of Meriwether.

The only reasonable solution of his conduct is that he, together with the appellant, was then holding the property as the security only of the money advanced by them to redeem it. Meriwether, after he became interested in the executions, and before he sold to W. C. Williams, sr., stated to his son "that he had met Williams, jr., who told him that the time for redeeming the land expired on that day, and he had no money; that he (Meriwether) regarded it as valuable land, and that it came near being sacrificed at a mere song; that himself and W. C. Williams stepped forward and paid it off." In a subsequent conversation he stated "that he (Meriwether) was hard pressed for money, and that he would have to transfer to W. C. Williams his interest in the land, and Mrs. Meriwether, his wife, then asked her husband if Williams, jr. (the appellee), had been protected, and he replied that the property was worth some fifteen or twenty thousand dollars, and that the understanding was between him and Williams, sr., that whenever the appellee would pay off the debt and interest he might have the property back."

In addition to all this both Meriwether and the appellant were witnesses in the divorce suit between appellee and his

wife; they knew of her claim for alimony, and that the land was being valued as a part of appellee's estate. They had purchased this land under execution levied before the institution of the suit, and never during the progress of that tedious litigation asserted any right or title to the property; but, on the contrary, their claims were reported merely as moneys advanced for the appellee, showing his entire indebtedness in order to regulate the allowance for alimony. Both Meriwether and Williams, sr., had interested themselves in this suit, and Williams, sr., no doubt consulted the lawyers of his cousin (Williams, jr.) oftener than the latter himself did in regard to it.

These facts, connected with the confidential relations existing between these parties, and the great inadequacy of price paid by them for this land they claim to have bought unconditionally, forces the mind to the conclusion that Meriwether and appellant were up to the time of the sale by Meriwether to the appellant holding this land as a security only for the repayment of the moneys advanced by them for the appellee, and this conclusion is strengthened by the acts and declarations of the appellant in regard to this land after his purchase from Meriwether. After the conveyance by Meriwether to appellant of his interest, we find the appellant with the legal title to this land, worth from twenty to thirty thousand dollars, at a cost to him of less than three thousand dollars. The conveyances made of this land by the sheriff and commissioner to the appellant were made, so far as the proof shows, without the knowledge of the appellee; but that in a short time afterward he knew that they had been thus made is clearly established.

In July, 1860, the appellant addressed a letter to the appellee. He says that his mind had "been called to the business matters between himself and appellee; that his object in aiding him was to extricate him (appellee) from the meshes

he had fallen into by reason of his unfortunate marriage," and adds: "I want you to be a free man, and the only way I see on earth is for you to dispose of some of your property; and I would say to you avoid the eating moth of interest. I am disposed to take your lots at a fair cash value, in order that we may bring matters to a close. As I consider it improvident to have things in a loose and unsettled state, I want you to see the most you can get between this and Saturday, and we can confer," etc.

It seems the appellee had made a division of this land into six five-acre lots, and had employed C. Green, an auctioneer, to sell them at public auction; the property was advertised by Green, giving the locality of the land and the terms of sale. This witness says that after he had advertised the lots he met the appellant in Louisville, and spoke to him of the intended sale, and the appellant then remarked that *he* (appellant) *would have* to make the deeds to the purchasers; that he was holding the property for appellee, and would make the deeds when the sale was over. This was in the year 1860. The price offered for these lots was not deemed sufficient, and the property was withdrawn from the market. Here was a plain and unmistakable recognition of the appellant's right to the property by agreeing to make the deeds to the purchasers, and in fact by letter offering to buy the property himself.

In 1869 the appellee again employed a real estate agent to sell this property, and this agent made a contract with a man by the name of James, by which he agreed to take twelve acres of the land at two thousand two hundred and fifty dollars per acre. The appellant read the contract between the parties, assented to the sale, and agreed to make the deed. This sale was not perfected, and the reason was that the appellant refused to surrender his title unless he was paid five thousand dollars.

The declaration was made time and again by the appellant,

from the years 1856 up to 1869, that this land belonged to the appellee, and that he was holding it for him. The letters of appellant to appellee, while in Missouri, and before Meriwether sold his interest, all tend to show that the land was regarded by appellant as appellee's property. It is true that the appellant listed the property for taxation, and that it was leased by himself and Meriwether for several years; still in all this leasing the appellee *seems* to have had some connection with the property; he was the only person ever seen or known upon the farm by the tenants, repairing and looking to its cultivation, and seemed to be so much interested in it as to induce one of the tenants, Oldham, to ask him if he owned it. The appellee attested one of the leases, and was perhaps called on as a witness in regard to it, but was not examined. In the preparation of the pleadings in a suit against one of the tenants for waste and rents the appellant directed the lawyer to advise with the appellee, in order to the proper understanding of the case; and although he said to the lawyer that it was the old man's property, still we find the appellant directing the officer who had collected the rent under a distress warrant to pay it over to the appellee, as it was appellee's land. The appellee, during the whole period between the years 1855 and 1869, except while he was in Missouri, seemed to be always present when leases were executed, and invariably attending to the interests and repairs on the land; and the proof of appellant, when taken in connection with the proof of appellee, rather increases than lessens the force of appellee's testimony. Why it was the title was held in the appellant so long is a question not easily answered. The appellant may have supposed that with the legal title to the property vested in him it would be safe from the improvident management of the appellee. It is certain, however, that during this whole period there was a continued recognition by appellant of the appellee's right to the property.

We have been unable to perceive how the wife was defrauded by this mode of holding the title to the land. There was no effort to set up any adverse title to the property so as to defeat the wife's claim for alimony; but, on the contrary, it was acknowledged to belong to the appellee, and the moneys that had been advanced for him listed in that suit as a part of his indebtedness.

There are many facts in the record that do not speak well for the appellee, but no such state of case is presented as would authorize this court to divest him of this valuable estate upon a consideration so grossly inadequate, and having its inception from his unfortunate troubles and pressing necessities for money.

The counsel for appellant, in a very able and elaborate brief, insists that although the facts proven by appellant may be regarded as uncontroverted, still the statute of frauds precludes his right of recovery, as the alleged agreement is not in writing. The facts show that this was not a sale of any lands to the appellee by appellant, but a *mere* holding of the legal title obtained upon a promise made to extend the time for redeeming the plaintiff's property, and as a security for the moneys they had advanced for him.

In the case of Griffin and wife v. Coffey (9 B. Monroe, 452) the dower interest of Griffin's wife in a house and lot was sold under execution by the sheriff, and purchased by Gann. The sheriff conveyed the property to Gann; but, being subject under the law to redemption, Gann sold and conveyed it to Coffey. Griffin and wife filed their bill in this case alleging that Coffey redeemed the property for them, and took a conveyance at their request, and was to hold the land for indemnity. Coffey denied the trust and claimed the property as his own. The allegations of Griffin and wife were sustained by the proof, and the court held in this case "that it was not a purchase by Coffey from Gann, the legal title-holder, but it was a pledge

by Griffin and wife to Coffey of their equity of redemption until Coffey was repaid, and a mere extension of the time for redemption, which could be done by the verbal agreement of the parties."

In the case of Martin v. Martin (16 B. Monroe, 8) the commissioner of the Anderson Circuit Court sold a tract of land belonging to Josiah Martin to satisfy a judgment in behalf of Lancaster and others. Draffin bought the land for Josiah Martin, as he informed him after the sale, to prevent a sacrifice of his property. Draffin afterward transferred the benefit of his purchase to E. Martin, with the agreement that he was to take Draffin's place in the purchase, pay the money bid by him for the land, and when his brother paid him he was to have the land back. After this transfer by Draffin, E. Martin procured an order for a conveyance of the land to himself. Josiah Martin, upon this state of case, brought his suit to cancel the deed and have the possession of the land surrendered to him. It was held "that, although the agreement was in parol, it was a trust that the purchaser could not refuse to perform," and relief was granted.

In the case of Miller's heirs v. Antle (2 Bush, 408) Miller purchased under a decretal sale at much less than its value Antle's land, containing two hundred and seventeen acres. By an agreement in parol between Miller and Antle before the purchase, Antle was to have one hundred and seventeen acres of this land on payments. Miller after his purchase lived on the one hundred acres, and Antle retained his one hundred and seventeen acres. Miller died, having received before his death fourteen hundred dollars of the money from Antle. Miller had also obtained a deed from the commissioner for the whole land. In this case, upon a petition filed by Antle, it was adjudged that he was entitled to the land.

In the case of Green v. Ball (4 Bush, 586) Mitchell purchased the land at a sale by the commissioner, and agreed

verbally with Green, the owner, that he would become the purchaser to prevent a sacrifice, and that all legal and equitable rights that he might then acquire should operate only as a mortgage to secure him in the repayment of the moneys advanced. Mitchell afterward obtained a conveyance of the land, and sold and conveyed it to Ball, who had notice of the parol agreement between Mitchell and Green. The court held that such a parol contract was not within the statute of frauds, and granted the owner relief as against the last purchaser.

The numerous authorities referred to by counsel for the appellant are not in conflict with the authorities already referred to. In our opinion this was a trust that might have been enforced as against either Meriwether or the appellant, and that they obtained the deeds and held the property merely to secure them in the moneys they had advanced for the appellee, and that such was the understanding and agreement of all the parties.

In the case of Thomas v. McCormick (9 Dana, 108) the court says that there can be no doubt that McCormick understood and intended that the conveyance should be absolute on its face, and then decides that parol testimony can not be admitted in opposition to the legal import of the deed unless upon an allegation of fraud or mistake or vice in the consideration.

We can not perceive how that principle is to be made applicable to the present case. Here no sale was made as between the parties, but a mere holding by the appellant by reason of the transfer of the executions under which the land had been sold, to enable the appellee to redeem it, and to secure the appellant in the moneys he had advanced for him. It might well be argued that the manner in which the deeds were procured by appellant was a fraud upon the appellee; their execution, however, to appellant can not affect the rights of the appellee under the facts of this case.

Wm. C. Williams, sr. v. Wm. C. Williams, jr.

The judgment of the court below, permitting the appellee to redeem the land, was proper, and is now affirmed. The commissioner's report, however, is defective, and the exceptions filed by appellant as to the claim of appellee for services should have been sustained. There is no reason why the statute of limitations is not a bar to appellee's claim for services. There was no trust created in any way by the employment of appellee to rent appellant's lands. It is like any other claim for work and labor or services performed, and his claim, existing for a longer period than five years previous to this suit, should have been rejected. The testimony of the witness, Corcoran, in regard to the acknowledgment of the claim of appellee for services by appellant, is not deemed sufficient to take the case out of the statute. His whole testimony impresses the mind with the belief that he is very favorable, to say the least of it, to appellee in this controversy, and his statement as to this acknowledgment is inconsistent with other facts in this record bearing upon the same point. The appellant, according to this statement of Corcoran, is presented with this large account, amounting to five thousand five hundred dollars for eleven years' services, and with scarcely time to look at it pronounces it all right. This account charges five hundred dollars per year for the services, when the proof shows that he was only to have ten per cent. on the amount collected; and in addition to all this it is not to be presumed that he would collect this money during a period of eleven years, in pressing need of money himself, and never retain one dollar for his services. Three hundred dollars per annum is as much as the appellee is entitled to for his services for the five years next preceding the institution of this suit.

The commissioner erred in allowing the appellant ten per cent. interest on the amount of the executions under which this property was sold for a longer period than one year. He should calculate interest for one year at ten per cent., and

after adding principal and interest together calculate interest upon the result at six per cent.

The commissioner's report should be made to conform to this opinion; and for the balance due appellant, if not paid, the land or a sufficiency thereof should be sold. Upon the payment of the money the appellant should be required to convey to appellee the land.

The judgment is reversed on the original appeal so far as it is adjudged that appellee shall recover of the appellant $404.52 with interest, and affirmed on cross-appeal. The cause is remanded for further proceedings in conformity with this opinion.